UNSEALED

\* 10/18/13

United States District Court
Southern District of Texas
FILED

OCT 15 2013

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | Criminal No. **M-13-1576** |
| FRANK MATILDE GONZALEZ GRACIELA LOZANO ESCAMILLA | § § § | |

## SEALED INDICTMENT

**THE GRAND JURY CHARGES:**

At all times material to this Indictment:

### THE MEDICARE PROGRAM

1. The Medicare Program ("Medicare") was a federal health care benefit program signed into law in 1965, as Title XVIII of the Social Security Act, for the purpose of providing federal funds to pay for certain specified medical benefits, items, or services (hereinafter referred to as "medical services") furnished to individuals who were over the age of 65, blind, disabled, and who were qualified and enrolled as Medicare beneficiaries. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Medicare was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

2. The Medicare program consisted of multiple parts, including, Part A (Hospital Insurance), Part B (Medical Insurance), and Prescription Drug Coverage. Part A helped cover inpatient care in hospitals, including critical access hospitals, and some skilled nursing facilities. It also helped cover hospice care and some home health care services. Part B helped pay for certain physician services, outpatient services, medical equipment, and certain ambulance

transportation services. Part B helped pay for covered benefits when they were medically necessary and when the Medicare beneficiaries met certain conditions.

3. Medicare assigned every person qualified and enrolled as a Medicare beneficiary a unique personal Medicare identification number known as a Health Insurance Claim Number, often referred to as a ("HICN").

4. Medicare funds were intended to pay for medical services furnished to Medicare beneficiaries by enrolled Medicare providers and suppliers when such medical services were furnished in accordance with all of the rules regulations and laws which governed the Medicare program. There was no significant difference between the terms "provider" and "supplier", and the term "provider" will be used herein.

5. A person or entity that desired to become a Medicare provider was required to submit an application, and sign an agreement, which included a promise to comply with all Medicare related laws and regulations. Medicare assigned a unique "Medicare Provider Identifier" (MPI) to each approved Medicare provider. A person or entity with a MPI could file claims, also known as bills, with Medicare to obtain reimbursement for covered medical services which were furnished to Medicare beneficiaries in accordance with the rules, regulations, and laws pertaining to the Medicare program. The Medicare Provider Manual, bulletins, and newsletters distributed and available to all Medicare providers, and to the public, contained the rules and regulations pertaining to Medicare-covered medical services and instructions on how to appropriately bill for medical services furnished to Medicare beneficiaries. The Medicare rules and regulations were published in various forms and made available to all Medicare providers and to the public.

6. CMS contracted with private contractors, typically insurance companies, to

provide certain administrative services for Medicare, such as provider enrollment, claims processing and payment. A contractor that provided administrative services under Part B of Medicare was sometimes referred to as a "carrier."

7. In order to receive reimbursement from Medicare for medical services to beneficiaries, Medicare providers submitted, or caused the submission of claims to a Medicare carrier. Claims could have been submitted either directly by the provider, or through a billing company selected by the Medicare provider. Claims could have been submitted either in paper form or electronically. Medicare providers could only submit claims on, or after, the "date of service" to the beneficiary. Although Medicare providers may have sometimes submitted claims in groups for efficiency, every claim was considered individually.

8. Medicare ambulance services providers were required to submit their Medicare claims on a standardized form commonly referred to as a "Form 1500", "HCF 1500", or "CMS 1500." Certain specific information was required to be on each claim form, including but not limited to the following:

    a. the beneficiary's name and unique personal Medicare identification number (HICN);

    b. the date of service;

    c. the specific uniform code for the diagnosis of, or nature of, the Medicare beneficiary's illness, injury, or condition;

    d. the specific uniform national Healthcare Common Procedure Coding System (HCPCS) code established by CMS to define and describe the ambulance services for which payment was sought;

    e. the name and unique physician identification number ("UPIN") or national provider identifier ("NPI") of the physician who prescribed or ordered the ambulance services for which payment was sought; and

    f. the provider's MPI number; and

g.  origin and destination codes, and all applicable modifier codes.

9.  Origin and destination codes, and modifier codes were sometimes required to provide additional information regarding the ambulance services, such as when the information provided by a HCPCS code descriptor needed to be supplemented to identify specific circumstances that applied to the ambulance services.

10.  For each claim submitted, the Medicare provider certified, among other things, that: (a) the information on the claim for was true, accurate, and complete; (b) the medical services had been provided to the Medicare beneficiary; and (c) the medical services listed on the claim were medically indicated and necessary to the health of the Medicare beneficiary.

11.  Claims to Medicare were paid either by paper check delivered by the United States Postal Service or by wire or radio transmissions, in transactions known as electronic funds transfers.

## THE MEDICAID PROGRAM

12.  The federal Medical Assistance program (commonly known as the Medicaid program), was a federal health care benefit program signed into law in 1965, as Title XIX of the Social Security Act, for the purpose of providing joint state and federal funds to pay for medical benefits items or medical services furnished to individuals of low income who were qualified and enrolled as Medicaid beneficiaries. States desiring to participate in, and receive funding from, the federal Medicaid program were required to develop a "state plan" for medical assistance and obtain approval of the plan from the United States Department of Health and Human Services. Upon approval of its state plan, each individual state administered its own Medicaid program, subject to

the requirements of the state plan, the Social Security Act, the United States Department of Health and Human Services and all other applicable state and federal laws.

13. The Texas Medical Assistance Program also known as the Texas Medicaid program (herein after referred to as "Texas Medicaid"), was implemented under the provisions of Title XIX of the federal Social Security Act and Chapter 32 of the Texas Human Resources Code, for the purpose of providing joint state and federal funds to pay for medical benefits items or medical services furnished to individuals of low income who were qualified and enrolled as Texas Medicaid beneficiaries. Texas Medicaid was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

14. Texas Medicaid assigned every person qualified and enrolled as a Texas Medicaid beneficiary a unique personal Texas Medicaid identification number known as a Patient Control Number ("PCN").

15. The Texas governmental agency known as the Health and Human Services Commission ("HHSC") was the single state Medicaid agency in Texas responsible, subject to oversight by the federal government, for administering the Texas Medicaid program at the state level. Federal funding was only available to the Texas Medicaid program as long as the Texas Medicaid program complied with the terms and requirements of the state plan, the Social Security Act, the United States Department of Health and Human Services, and all other applicable state and federal laws, and with the rules and regulations established by both the federal government and the State of Texas pertaining to Texas Medicaid.

16. The Texas Medicaid & Healthcare Partnership (hereinafter referred to as "TMHP") was under contract with HHSC to provide certain administrative functions such as provider enrollment, claims processing and payment, and publishing the Texas Medicaid Provider

Procedures Manual which contained the rules and regulations of the Texas Medicaid program established by the state plan and by HHSC.

17. Texas Medicaid funds were intended to pay for covered medical services furnished to Texas Medicaid beneficiaries, by enrolled Texas Medicaid providers, when such medical services were furnished in accordance with all of the rules, regulations, and laws which governed Texas Medicaid; and for crossover claims described in paragraph 19 below, when the medical services were also furnished in accordance with all of the rules, regulations, and laws which governed Medicare.

18. A person or entity that desired to become a Texas Medicaid provider was required to submit an application and sign an agreement which included a promise to comply with all Texas Medicaid related laws and regulations. Texas Medicaid assigned a unique Texas Provider Identifier ("TPI") number to each approved Texas Medicaid provider. A person or entity with a TPI number could file claims, also known as bills, with Texas Medicaid to obtain reimbursement for covered medical services which were furnished to Texas Medicaid beneficiaries in accordance with the rules, regulations, and laws pertaining to the Medicaid program; and for crossover claims described in paragraph 19 below, when the medical services were also furnished in accordance with all of the rules, regulations, and laws which governed Medicare.

19. An individual who was a beneficiary under both Medicare and Texas Medicaid was sometimes referred to as a "dual-eligible beneficiary." When a service provided to a dual-eligible beneficiary was a benefit of both Medicare and Texas Medicaid, the Medicare provider was required to submit claims with Medicare first. After Medicare paid the allowed amount of the claim (usually 80 percent), the remaining balance was automatically submitted to Texas Medicaid for payment as what was generally referred to as a "crossover claim." Texas Medicaid paid

crossover claims only if Medicare had paid first, and only if the provider had followed all of the rules, regulations, and laws which governed both Medicare, and Texas Medicaid.

20. Texas Medicaid would only pay reimbursement for medical services, which were medically necessary to the treatment of the beneficiary's illness, injury, or condition.

21. To receive reimbursement from Texas Medicaid for medical services to beneficiaries, Texas Medicaid providers submitted or caused the submission of claims to Texas Medicaid, either directly or through a billing company. Claims could be submitted either in paper form or electronically. Texas Medicaid providers could only submit claims on or after the "date of service" to the beneficiary. Although Texas Medicaid providers may have sometimes submitted claims in groups for efficiency, every claim was considered individually.

22. Texas Medicaid ambulance services providers were required to submit their Texas Medicaid claims on a standardized form commonly referred to as a "Form1500", "HCF 1500", or "CMS 1500." Certain specific information was required to be on each claim form, including but not limited to the following:

    a. the beneficiary's name and unique personal Texas Medicaid identification number (PCN);

    b. the date of service;

    c. the specific uniform code for the diagnosis of, or nature of, the Texas Medicaid beneficiary's illness, injury, or condition;

    d. the specific uniform national Healthcare Common Procedure Coding System (HCPCS) code established by CMS to define and describe the ambulance services for which payment was sought;

    e. the name and unique physician identification number ("UPIN") or national provider identifier ("NPI") of the physician who prescribed or ordered the ambulance services for which payment was sought;

    f. the provider's TPI number; and

g.  origin and destination codes, and all applicable modifier codes.

23. Origin and destination codes, and modifier codes were sometimes required to provide additional information regarding the ambulance services, such as when the information provided by a HCPCS code descriptor needed to be supplemented to identify specific circumstances that applied to the ambulance services.

24. For each claim submitted, the Texas Medicaid provider certified, among other things, that: (a) the information on the claim form was true, accurate, and complete; (b) the medical services had been provided to the Texas Medicaid beneficiary; and (c) the medical services listed on the claim were medically indicated and necessary to the health of the Texas Medicaid beneficiary.

25. Claims to Texas Medicaid were paid either by paper check delivered by the United States Postal Service or by wire or radio transmissions, in transactions known as electronic funds transfers.

## MEDICARE COVERAGE FOR END STATE RENAL DISEASE

26. Beginning in 1972, Medicare provided coverage for beneficiaries with End Stage Renal Disease (hereinafter referred to as "ESRD").

27. ESRD patients generally suffered from kidney failure and required regular dialysis treatments. Dialysis treatments usually consisted of three treatment sessions a week that were scheduled in advance. Each treatment session usually lasted between 3 to 4 hours.

28. Most ESRD patients did not need ambulance transportation to their dialysis treatment sessions.

## MEDICARE COVERAGE FOR AMBULANCE TRANSPORTATION

29. The Medicare benefits for ambulance transportation services were very restricted. Medicare covered ambulance transportation services only if the services were furnished to a beneficiary whose medical condition, at the time of transport, was such that transportation by other means would endanger the patient's health. Medicare did not pay for ambulance transportation for beneficiaries whose medical condition permitted transportation in any non-ambulance vehicle. Specifically, Medicare did not cover transportation in vans, privately-owned vehicles, taxicabs, Ambi-buses, ambulates, or Medi-cabs. Medicare payment for ambulance transportation depended on the patient's condition at the actual time of the transport regardless of the patient's diagnosis. To be deemed medically necessary for payment for ambulance transportation services, the patient must have required both transportation by ambulance and one or more of the categories of ambulance services described below in paragraphs 36 through 40.

30. In the absence of an emergency condition, ambulance transportation services were only covered if the patient's doctor certified that the patient needed transportation by ambulance, and if one, of both, of following circumstances existed: (1) the patient being transported could not have been transported by any other means from the point of origin to the destination without endangering the patient's health, or (2) the patient was bed confined before, during and after transportation. For purposes of Medicare coverage, "bed confined" meant that the patient met all of the following three criteria. The patient had to have been:

      (a)    unable to get up from bed without assistance;

      (b)    unable to ambulate (walk about or move from place to place); and

      (c)    unable to sit in a chair (including a wheelchair).

31. A thorough assessment and documented description of the patient's medical condition at the time of ambulance transportation was essential for Medicare coverage for ambulance transportation. Medicare required that an ambulance services provider's comments or statements about the patient's medical condition or bed-bound status be validated in the Medicare ambulance services provider's documentation using contemporaneous objective observations and findings.

32. Medicare ambulance services providers were required to completely document the patient's condition at the time of the transport in order to provide justification that ambulance transportation was required. Medicare required a description of the patient's symptoms and physical findings in sufficient detail to demonstrate that the patient's conditions were severe enough to justify payment for ambulance transportation services.

33. Because each non-emergency ambulance transport had to be medically necessary, Medicare reimbursed ambulance providers separately for each separate leg of a round trip.

34. In order to qualify for payment for ambulance transportation services, Medicare required that the vehicle used as an ambulance be specifically designed or equipped to respond to medical emergencies and, in non-emergency situations, be capable of transporting beneficiaries with acute medical conditions. Medicare required that the vehicle comply with state and local laws governing the licensing and certification of emergency transportation vehicles. At a minimum, each ambulance was required to contain a stretcher, linens, emergency medical supplies, oxygen equipment and other lifesaving emergency medical equipment, and be equipped with emergency warning lights, sirens and telecommunications equipment as required by state and local law. Including, at a minimum, one two-way voice radio or wireless telephone.

35. Texas Medicaid paid cross-over claims for the ambulance transportation services provided when all of the conditions contained in paragraph 19 were met.

## CATEGORIES OF AMBULANCE SERVICES

36. Medicare only covered ambulance transportation services when the patient's condition required transportation by ambulance and one or more the following ambulance services:

    (a)    Basic Life Support;

    (b)    Basic Life Support - Emergency;

    (c)    Advanced Life Support - Level 1; or

    (d)    Advanced Life Support - Level 2.

37. Basic Life Support (BLS) was transportation by ground ambulance vehicle with medically necessary supplies and medical services. The ambulance had to be staffed by an individual who was qualified in accordance with state and local laws as at least an emergency medical technician-basic.

38. Advanced Life Support (ALS) was transportation by ground ambulance vehicle with medically necessary supplies and medical services including the provision of an ALS assessment or at least one ALS intervention. An ALS assessment was an assessment performed by an ALS crew as part of the emergency response that was necessary because the patient's reported condition at the time of dispatch was such that only an ALS crew was qualified to perform the assessment. An ALS intervention was a procedure that, in accordance with State and local laws, was required to be done by an emergency medical technician-intermediate or emergency medical technician-paramedic. An ALS assessment did not necessarily result in a determination that the patient required an ALS level of service

11

39. ALS - Level 1 required an emergency response which was medically necessary. An emergency response was one required the ambulance transportation provider to responded immediately when it received the call. An immediate response was one in which the ambulance transportation provider began to take the steps necessary to respond to the call as quickly as possible. The determination to respond emergently with an ALS ambulance had to be in accord with the local 911 or equivalent service dispatch protocol.

40. ALS - Level 2 was transportation by ground ambulance vehicle with medically necessary supplies and medical services including (1) at least three separate administrations of one or more medications by intravenous push/bolus or by continuous infusion (excluding crystalloid fluids), or (2) the provision of at least one of the following ALS - Level 2 procedures:

    a. Manual defibrillation/cardio version;

    b. Endotracheal intubation;

    c. Central venous line;

    d. Cardiac pacing;

    e. Chest decompression;

    f. Surgical airway; or

    g. Intraosseous line.

41. A requirement for Medicare payment for ambulance transportation was that the needed medical services of the ambulance personnel were provided and that clear clinical documentation validated said medical need.

42. Medicare and Medicaid paid a higher reimbursement rate for ALS ambulance transportation services than for BLS ambulance transportation services.

43. For each ambulance transport, the emergency medical technician aboard the ambulance was required to prepare a report (commonly referred to as a "run sheet") which included the patient's condition, such as blood pressure, pulse, respiration, general physical condition, and any physical complaints. Run sheets were to document a patient's condition, the necessity for any care rendered, and the care a provider actually rendered to the patient. Complete and accurate medical documentation in run sheets was essential for two reasons: first, it was a necessary component to proper medical care and ensured that the patient received informed care by any subsequent provider; and second, the documentation was necessary to support any claim for reimbursement submitted by the provider.

44. A patient's ability to walk about or move from place to place, sit in a chair or wheelchair, and the patient's means of entering the ambulance were medically significant facts and should have been noted on the run sheet in order to ensure that the medical records were complete and accurate.

## MED-ALERT AND THE DEFENDANTS

45. Defendant FRANK MATILDE GONZALEZ, was a resident of Hidalgo County, Texas and was the owner and operator of River Valley Transport, Inc., dba Med-Alert EMS (hereinafter referred to as Med-Alert).

46. On or about October 12, 2004, defendant FRANK MATILDE GONZALEZ, on behalf of Med-Alert, applied to be an ambulance service provider in the Medicare program. Medicare Provider Identifier (MPI) # AMB395 was assigned to Med-Alert.

47. On or about December 27, 2004, defendant FRANK MATILDE GONZALEZ, on behalf of Med-Alert, applied to be an ambulance service provider in the Texas Medicaid program.

Texas Provider Identifier (TPI) #1701724 was assigned to Med-Alert. National Provider Identifier (NPI) #1346457454 was assigned to Med-Alert.

48. Med-Alert ostensibly provided ambulance services to Medicare and Texas Medicaid beneficiaries (hereinafter referred to as beneficiaries) in Hidalgo County, Texas.

49. Defendant GRACIELA LOZANO ESCAMILLA was a resident of Hidalgo County, Texas and was the owner and operator of Rio Plex Billing Solution (hereinafter referred to as Rio Plex). Rio Plex was a company that submitted health care billings to Medicare and Texas Medicaid on behalf of Medicare and Texas Medicaid providers. Defendant GRACIELA LOZANO ESCAMILLA and Rio Plex, under contract with defendant FRANK MATILDE GONZALEZ and Med-Alert, acted as the biller for defendant FRANK MATILDE GONZALEZ and Med-Alert, and were responsible for billing Medicare and Texas Medicaid for ambulance services ostensibly provided to Medicare and Texas Medicaid beneficiaries. Under said contract defendant GRACIELA LOZANO ESCAMILLA and Rio Plex, were to receive 6% of all money paid by Medicare and Texas Medicaid to FRANK MATILDE GONZALEZ and Med-Alert for ambulance transportation services.

## MEDICARE AND TEXAS MEDICAID BILLINGS AND PAYMENTS

50. From on or about June 1, 2007, through on or about February 4, 2011, defendants FRANK MATILDE GONZALEZ and defendant GRACIELA LOZANO ESCAMILLA submitted, and caused others to submit, approximately 1,524 false and fraudulent claims in the approximate aggregate sum of $638,090.00 to Medicare and Texas Medicaid, for ambulance transportation services which were not provided to Medicare and Texas Medicaid beneficiaries, or were not properly provided. As a result of said false and fraudulent claims, Medicare and Texas Medicaid paid the approximate aggregate sum of $335,056.50.

## COUNT ONE
## CONSPIRACY TO COMMIT HEALTH CARE FRAUD

51. The Grand Jury incorporates by reference paragraphs 1 through 50 as though fully restated and re-alleged herein.

52. Beginning on or about June 1, 2007, and continuing until on or through February 4, 2011, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown to the Grand Jury, defendants,

**FRANK MATILDE GONZALEZ and
GRACIELA LOZANO ESCAMILLA**

did conspire and agree together, with each other, and with other persons known and unknown to the Grand Jury, to knowingly and willfully, in violation of Title 18, United States Code, Section 1347, execute a scheme and artifice to defraud the health care benefit programs known as Medicare and Texas Medicaid or to obtain, by false or fraudulent pretenses, representations, or promises, any of the money and or property owned by or under the control of said health care benefit programs in connection with the delivery of or payment for health care benefits, items, and medical services.

All in violation of Title 18, United States Code, Section 1347 and 1349.

### OBJECT OF CONSPIRACY

53. The object and purpose of the conspiracy and scheme was to defraud the health care benefit programs known as Medicare and Texas Medicaid, and to obtain by false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of the health care benefit programs known as Medicare and Texas Medicaid, in connection with the delivery of, or payment for, health care benefits, items, or medical services.

## MANNER AND MEANS

54. In order to execute and carry out their illegal activities, defendants FRANK MATILDE GONZALEZ and GRACIELA LOZANO ESCAMILLA committed, aided and abetted the commission, or otherwise caused others to commit, one or more of the following acts:

(a) Defendants submitted or caused others to submit claims with Medicare and Texas Medicaid for reimbursement of ambulance transportation services that were not provided, such as billing for transporting beneficiaries to and from dialysis clinics on dates when the beneficiaries did not receive dialysis treatments or go to the dialysis clinics. The defendants filed the claims with Medicare and Texas Medicaid knowing that said claims were false and fraudulent since the transportation of beneficiaries was not provided.

(b) Defendant FRANK MATILDE GONZALEZ's mother transported a patient to and from dialysis treatment in a non-ambulance vehicle, namely a personal mini-van. The defendants fraudulently billed the transportation provided in the mini-van as ambulance transportation.

(c) Defendants created or caused the creation of falsified run sheets which were intended and calculated to make the fraudulent claims submitted to Medicare and Texas Medicaid appear legitimate. Defendants falsified and altered the required run sheets by entering dates on said run sheets for dates of ambulance transportation services when no ambulance transportation had been provided as claimed in their billings to Medicare and Texas Medicaid. Defendants photocopied information from previous run sheets of a beneficiary in an attempt to make it appear that they had properly documented subsequent runs involving that beneficiary.

(d) Defendants falsified, altered, and created run sheets by filling out the run sheets to make it appear that a particular emergency medical technician had been involved in the transportation of a beneficiary when that emergency medical technician had not been involved in the transportation. Defendants forged the signatures of the emergency medical technicians on said run sheets without their authorization or permission.

(e) Defendants created run sheets for ambulance transportation services on dates when no ambulance transportation was provided because the beneficiaries were hospitalized and unable to be transported and otherwise not in need of ambulance transportation.

(f) Defendants billed for ALS services, a higher level and higher-paying ambulance code, in order to receive a higher reimbursement from Medicare and Texas

        Medicaid when ALS services were not provided and were not medically necessary.

(g)    Defendant GRACIELA LOZANO ESCAMILLA instructed other billers at Rio Plex to bill Medicare and Texas Medicaid for ambulance transports for Med-Alert at the higher-paying code of ALS regardless of whether that service was medically necessary or provided by Med-Alert.

(h)    During and in relation to their fraudulent conduct and to further their scheme and artifice to defraud Medicare and Texas Medicaid, defendant FRANK MATILDE GONZALEZ knowingly used the United States Postal Service to execute their scheme and artifice to commit health care fraud by submitting and mailing appeals of false and fraudulent claims which had previously been denied.

(i)    During and in relation to their fraudulent conduct and to further their scheme and artifice to defraud Medicare and Texas Medicaid, defendants FRANK MATILDE GONZALEZ and GRACIELA LOZANO ESCAMILLA knowingly transferred possessed, or used, or knowingly caused others to transfer, possess, or use, without lawful authority, one of more means of identification of Medicare and Texas Medicaid beneficiaries which they used to execute their scheme and artifice to commit health care fraud.

## COUNTS TWO THROUGH EIGHT
## HEALTH CARE FRAUD

55.    The Grand Jury incorporates by reference paragraphs 1 through 50 and paragraph 54 as though fully restated and re-alleged herein.

56.    Beginning on or about June 1, 2007, and continuing until on or through February 4, 2011, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown to the Grand Jury, defendants,

**FRANK MATILDE GONZALEZ and
GRACIELA LOZANO ESCAMILLA**

did knowingly and willfully execute or attempt to execute a scheme or artifice to defraud the health care benefit programs known as Medicare and Texas Medicaid, or to obtain by false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of the health care benefit programs known as Medicare and Texas Medicaid, in

connection with the delivery of, or payment for, health care benefits, items, or medical services. Defendants submitted, aided, abetted, counseled, commanded, induced, procured or otherwise facilitated or caused each other, and others, to submit false and fraudulent claims to Medicare and Texas Medicaid, for medical benefits, items, and services which were not provided, or not properly provided, including, but not limited to the following:

| Count | Patient | Last 5 Digits of Applicable Patient Medicare and Medicaid Numbers | Date of Alleged Service (On or about) | Date Billed (On or about) | Amount Billed | Reason Claim Was False and Fraudulent |
|---|---|---|---|---|---|---|
| 2 | G.G. | Medicare 1592A | 10/2/2007 | 11/7/2007 | $790.00 | No ambulance transportation was provided. Patient was in hospital on date of alleged service. |
| 3 | J.S. | Medicare 8000A | 7/31/2008 | 8/19/2008 | $870.00 | No ambulance transportation was provided. Patient was in hospital on date of alleged service. |
| 4 | An.R. | Medicare 2643A | 9/20/2009 | 10/22/2009 | $770.00 | No ambulance transportation was provided. Patient was in hospital on date of alleged service. |
| 5 | A.D.L.G. | Medicare 4915B Medicaid 14647 | 10/14/2009 | 11/18/2009 | $910.00 | No ambulance transportation was provided. Emergency medical technician listed on run sheet was not working. |
| 6 | J.C. | Medicare 3907A Medicaid 76254 | 3/1/2010 | 8/6/2010 | $810.00 | No ambulance transportation was provided. Patient was driven in non-ambulance private vehicle. |
| 7 | Ad.R. | Medicare 9874A | 5/11/2010 | 6/28/2010 | $870.00 | No ambulance transportation was provided Patient was in hospital on date of alleged service. |
| 8 | H.M. | Medicare 0304A | 6/2/2010 | 8/12/2010 | $870.00 | No ambulance transportation was provided. Patient was in hospital on date of alleged service. |

All in violation of Title 18, United States Code, Sections 1347 and 2.

## COUNT NINE
## AGGRAVATED IDENTITY THEFT

57. The Grand Jury incorporates by reference paragraphs 1 through 50 and paragraph 54 as though fully restated and re-alleged herein.

58. Beginning on or about June 1, 2007, and continuing until on or through February 4, 2011, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown to the Grand Jury, defendants,

**FRANK MATILDE GONZALEZ and**
**GRACIELA LOZANO ESCAMILLA**

During and in relation to a felony violation of Chapter 63 of the United States Code, did knowingly transfer, possess, and use, without lawful authority, a means of identification of another person, including but not limited to the following:

| Count | Patient | Last 5 Digits of Patient Medicare Number | Date of Alleged Service (On or about) | Date Billed (On or About) | Amount Billed | Reason Claim Was False and Fraudulent | Means of Identification Used Without Lawful Authority on False and Fraudulent Claim |
|---|---|---|---|---|---|---|---|
| 9 | Ad.R. | 9874A | 5/11/2010 | 6/28/2010 | $870.00 | No ambulance transportation was provided. Patient was in hospital on date of alleged service. | Patient's Medicare Number |

All in violation of Title 18, United States Codes, Sections 1028A and 2.

## COUNT TEN
## MAIL FRAUD

59. The Grand Jury incorporates by reference paragraphs 1 through 50 and paragraph 54 as though fully restated and re-alleged herein.

60. Beginning on or about June 1, 2007, and continuing until on or through February

19

4, 2011, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown to the Grand Jury, defendant,

**FRANK MATILDE GONZALEZ**

having devised and having intended to devise a scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing a such scheme or artifice to obtain payment for ambulance services which were not provided, did place in any post office or authorized depository for mail, documents appealing the denial of previously submitted false and fraudulent claims, including, but not limited to the following:

| Count | Patient | Last 5 Digits of Patient Medicare and Medicaid Numbers | Date of Alleged Service (On or about) | Date Claim Denied (On or about) | Reason Claim was Denied | Date Appeal of Fraudulent Claim Deposited in United States Mail (On or about) |
|---|---|---|---|---|---|---|
| 10 | H.M. | Medicare 0304A Medicaid 90360 | 9/8/2010 | 2/24/2011 | No ambulance transportation was provided. Patient was in hospital on date of alleged service. | 4/4/2011 |

All in violation of Title 18, United States Codes, Sections 1341 and 2.

A TRUE BILL

FOREPERSON

KENNETH MAGIDSON
UNITED STATES ATTORNEY

MICHAEL E. DAY
SPECIAL ASSISTANT UNITED STATES ATTORNEY